# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Mallon Roberts,
     Petitioner,

vs.

     Case No. 1:08cv113
     (Spiegel, S.J.; Hogan, M.J.)

Warden, Toledo Correctional
Institution,
     Respondent.

## REPORT AND RECOMMENDATION

Petitioner, an inmate in state custody at the Toledo Correctional Institution in Toledo, Ohio, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the petition and respondent's "Answer/Return Of Writ" with exhibits, as supplemented pursuant to a court order issued February 5, 2009 (*see* Doc. 14). (Docs. 1, 8, 15).[1]

### Procedural Background

On June 18, 2004, the Hamilton County, Ohio, grand jury indicted petitioner on one count of murder in violation of Ohio Rev. Code § 2903.02(A), with a Repeat Violent Offender (RVO) specification. (Doc. 8, Ex. 1).

Prior to trial, petitioner's counsel filed a motion in limine "for an order precluding the State of Ohio from mentioning at any time during the trial of this matter any prior convictions of defendant and from questioning or otherwise introducing into evidence any prior convictions of defendant." (*Id.,* Ex. 2). After hearing counsel's arguments at a hearing held on December 7 and 17, 2004, the court

---

[1]Also pending before the Court for ruling is petitioner's motion requesting a court order requiring respondent to provide the Court and petitioner with a transcript of the videotaped testimony of two State witnesses, Dr. Robert Pfalzgraf and Frances Green. (Doc. 16). The undersigned has denied that motion in a separate Order issued this date.

denied the motion in limine. (*Id.,* Ex. 5; Doc. 15, Vol. 6 Tr. 182-87 & Vol. 7 Tr. 191-96).

The matter proceeded to trial before a jury. During the trial, defense counsel moved to suppress evidence of petitioner's "other acts" before a different common pleas court judge, who presided over the trial and apparently agreed to revisit issues raised in the initial motion in limine. (*See* Doc. 8, Vol.11 Tr. 712-38 & Vol. 12 Tr. 880-81). The renewed motion to preclude the admission of the prior acts evidence was denied. (*Id.,* Ex. 6). On March 3, 2005, after hearing all the evidence presented at trial, the jury found petitioner guilty as charged of murder. (*Id.,* Vol. 15 Tr. 1129).

Prior to sentencing, petitioner's trial counsel filed a motion to dismiss the RVO specification. The trial court apparently overruled the motion and, on March 7, 2005, sentenced petitioner to a fifteen (15) year to life term of imprisonment for the murder offense, as well as a ten (10) year prison term on the RVO specification which "rais[ed] the minimum sentence to twenty-five (25) years to a maximum term of life." (*Id.,* Ex. 9).

With the assistance of new counsel appointed to represent petitioner on appeal (*see id.*), petitioner timely appealed to the Ohio Court of Appeals, First Appellate District. In the appellate brief, petitioner alleged as the sole assignment of error that the "trial court abused its discretion when it allowed tes[ti]mony of a prior act purportedly demonstrating identity and method." (*Id.,* Ex. 10). On March 2, 2007, the Ohio Court of Appeals overruled the assignment of error and affirmed the trial court's judgment. (*Id.,* Ex. 12).

Petitioner did not timely appeal the direct appeal decision to the Ohio Supreme Court. Instead, on August 21, 2007, petitioner filed a *pro se* motion for delayed appeal with the state supreme court. (*Id.,* Ex. 19). He claimed as "cause" for his delay in filing that "if it wasn't for having to to get prior approval from the Cashier Office at Toledo Correctional Institution for either legal postage or getting legal copies made," his "original Notice of Appeal [allegedly submitted to prison authorities on April 11, 2007] would have been filed timely." (*Id.*). On October 3, 2007, the Ohio Supreme Court denied petitioner's motion for delayed appeal and dismissed the case without opinion. (*Id.,* Ex. 20).

In the meantime, on May 21, 2007, petitioner did file a timely application under Ohio R. Appeal P. 26(B) for reopening of the appeal with the Ohio Court of Appeals, First Appellate District. (*Id.,* Ex. 13). In the *pro se* application, petitioner claimed

that his appellate counsel was ineffective in failing to raise claims on direct appeal challenging the sufficiency of evidence, trial counsel's performance, and the prosecutor's conduct during closing argument. (*Id.*).

On July 13, 2007, the Court of Appeals overruled petitioner's reopening application. (*Id.,* Ex. 15). The court reasoned that because petitioner could have raised the claims in an appeal to the Ohio Supreme Court, "res judicata precludes reopening the appeal on the proposed bases." (*Id.*).

Petitioner timely appealed to the Ohio Supreme Court, asserting in his memorandum in support of jurisdiction the same claims of error that he had raised in his reopening application to the Ohio Court of Appeals. (*Id.,* Ex. 16). On October 3, 2007, the Ohio Supreme Court summarily dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Ex. 18).

Petitioner commenced the instant habeas corpus action in February 2008. He alleges six grounds for relief:

**Ground One:** The trial court abused its discretion, when it allowed testimony of a prior act purportedly demonstrating identity and method.

**Ground Two:** Prosecutor's misconduct.

**Ground Three:** Insufficiency of evidence.

**Ground Four:** Ineffectiveness of appellate counsel.

**Ground Five:** Ineffectiveness of trial counsel.

**Ground Six:** State court[] abused its discretion when it [denied] petitioner's appellate 26(B) motion [on *res judicata* grounds].

(Doc. 1, pp. 6-11 & "Attachment").

In the return of writ filed in response to the petition, respondent contends that petitioner has waived the claims alleged in Grounds One, Two, Three and Five of the petition. (Doc. 8, Brief, pp. 9-14). He also argues that the claim alleged in Ground Six does not constitute a cognizable ground for federal habeas relief and that all of petitioner's claims for relief lack merit. (*Id.,* pp. 15-38).

3

## OPINION

### A. Petitioner Is Not Entitled To Relief Based On The State-Law Claim Alleged In Ground One And In The State Direct Appeal Proceedings, Challenging The Admission of "Other Acts" Testimony

In Ground One of the petition, petitioner alleges that the trial court abused its discretion in denying his motion to suppress "other acts" testimony, which was introduced by the State to establish his identity and method for the murder offense. (Doc. 1, p. 6). Petitioner raised this claim on direct appeal to the Ohio Court of Appeals. (*See* Doc. 8, Ex. 10). Respondent contends in the return of writ, however, that petitioner has waived the claim because he did not file a timely appeal to the Ohio Supreme Court from the appellate court's decision affirming his conviction. (Doc. 8, Brief, pp. 11-12). Respondent also argues that the claim, as alleged both in the instant petition and on direct appeal, presents an issue of state-law only which is not cognizable in this federal habeas proceeding. (*Id.*, p. 15).

As an initial matter, the Court assumes, without deciding, that the claim alleged in Ground One is not barred from review because petitioner failed to file a timely appeal to the Ohio Supreme Court and was denied a delayed appeal by that court.[2]

---

[2]The Ohio Supreme Court's unexplained denial of a delayed appeal motion "constitutes a[n adequate and independent state] procedural ruling sufficient to bar federal court review of [the] habeas corpus [claim]." *See Bonilla v. Hurley,* 370 F.3d 494, 497 (6th Cir.) (per curiam), *cert. denied,* 543 U.S. 989 (2004). "When a 'state prisoner has defaulted his federal claim[] in state court pursuant to [such] an independent and adequate state procedural rule, federal habeas review of the claim[] is barred unless the prisoner can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice.'" *Id.* (quoting *Coleman v. Thompson,* 501 U.S. 722, 750 (1991)). Here, petitioner has argued that "cause" exists for his procedural default because he timely submitted a notice of appeal to prison authorities for mailing on April 11, 2007, five days before the appeal period was due to expire, but the Ohio Supreme Court did not receive the notice until April 24, 2007. (*See* Doc. 8 , Ex. 19). A prison's inaction in mailing appeal pleadings submitted by a prisoner "in sufficient time for [them] to arrive timely in the normal course of events," constitutes cause for excusing a procedural default based upon a late filing. *Maples v. Stegall,* 340 F.3d 433, 438-39 (6th Cir. 2003) (citing *Mohn v. Bock,* 208 F.Supp.2d 796, 801-02 (E.D. Mich. 2002)) (cause for late filing existed where the prisoner had submitted his appeal papers to prison officials for mailing five days prior to the filing deadline); *see also Jenkins v. Timmerman-Cooper,* No. 3:04cv324, 2007 WL 2571945, at *5-6 (S.D. Ohio Aug. 31, 2007) (unpublished) (Rice, J.; Merz, M.J.). In light of this precedent, the undersigned assumes that petitioner similarly can show cause exists, which is sufficient to excuse his procedural default in this case.

4

Petitioner faces another hurdle, however. As respondent also has argued, petitioner has never alleged that the trial court committed error of constitutional magnitude in refusing to suppress the "other acts" testimony, but rather, both in the instant federal habeas petition and on direct appeal to the Ohio Court of Appeals, merely alleged a claim of error under Ohio law. (*See* Doc. 1, p. 6; Doc. 8, Ex. 10).

The Court is precluded from reviewing petitioner's claim to the extent petitioner alleges that the trial court abused its discretion under Ohio law in allowing the "other acts" testimony at trial. A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). This Court, therefore, only has jurisdiction to consider whether the alleged error violated the petitioner's federal constitutional right to due process. However, as respondent has suggested in the return of writ, it appears that petitioner has waived any such constitutional claim because he failed to present the federal issue to the Ohio courts.

In recognition of the equal obligation of state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b), (c); *Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). If he fails to do so, he may have waived the claims for purposes of federal habeas corpus review. *See Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

If, because of a procedural default, a petitioner can no longer present his claims to a state court, he has waived them unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

It is well-settled that in order to satisfy the "fair presentation" requirement, a habeas corpus petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000),

*cert. denied,* 532 U.S. 958 (2001); *Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir. 1987). This means the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *Franklin,* 811 F.2d at 325 (citing *Koontz v. Glossa,* 731 F.2d 365, 368 (6th Cir. 1984)); *see also Prather v. Rees,* 822 F.2d 1418 (6th Cir. 1987). A claim will be considered "fairly presented" without citation to chapter and verse of the Constitution only if the presentation of the claim was "likely to alert the court to the claim's federal nature." *Nadworny v. Fair,* 872 F.2d 1093, 1097 (1st Cir. 1989) (quoting *Daye v. Attorney General of New York,* 696 F.2d 186, 192 (2nd Cir. 1982) (en banc)).

A set of four guidelines has been developed for determining whether a claim was presented in such a way as to alert the court of the claim's federal nature. *Id.* Under these guidelines, a petitioner may fairly present to the state courts the constitutional nature of his claim by (1) relying on federal cases employing constitutional analysis; (2) relying on state cases employing constitutional analysis in similar factual contexts; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *McMeans,* 228 F.3d at 681; *Franklin,* 811 F.2d at 326 (quoting *Daye,* 696 F.2d at 193-94).

The use of a "generalized catch-all phrase," which merely alleges the denial of a fair trial under the United States Constitution, does not adequately alert the state courts of the constitutional nature of the claim where the "only legal theory presented to the state courts was predicated entirely upon state evidentiary law." *Franklin,* 811 F.2d at 326. General statements that the petitioner was denied a "fair trial" and "due process" are not sufficient to put state courts on notice of a specific federal constitutional claim in the absence of citation to case law employing federal constitutional analysis. *Petrucelli v. Coombe,* 735 F.2d 684, 688-89 (2nd Cir. 1984).

In this case, it is clear from the record that petitioner failed to fairly present to the state appellate court any federal due process claim stemming from the error alleged in Ground One of the petition. In his brief on appeal to the Ohio Court of Appeals, petitioner relied solely on state court decisions interpreting Ohio R. Evid. 404(B) and Ohio Rev. Code. § 2945.59, which govern the admissibility of "other acts" evidence in Ohio. (*See* Doc. 8, Ex. 10, pp. 5-6). Petitioner did not even mention in general terms that due process or fair trial concerns were implicated. Therefore, the only legal theories presented to and considered by the state appellate court in this case

were predicated entirely on state law.[3]

By thus failing to provide the Ohio courts with an opportunity to correct any error of constitutional dimension which may have arisen from the trial court's refusal to suppress the "other acts" testimony, petitioner has waived such claim for purposes of federal habeas review unless he has established "cause" for his default and actual prejudice as a result of the alleged error, or that failure to consider the constitutional claim will result in a "fundamental miscarriage of justice." *See Coleman,* 501 U.S. at 750; *see also Murray,* 477 U.S. at 485; *Isaac,* 456 U.S. at 129; *Sykes,* 433 U.S. at 87.

Petitioner has not provided any justification as "cause" for his procedural default in failing to argue that the admission of the "other acts" testimony deprived him of his due process right to a fair trial.

Moreover, he has not established that failure to consider the constitutional claim will result in a "fundamental miscarriage of justice." Under this exception to the waiver doctrine, petitioner must demonstrate that the alleged constitutional violation "probably resulted in the conviction of one who is actually innocent." *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995); *Bonilla v. Hurley,* 370 F.3d 494, 498 (6th Cir.) (per curiam), *cert. denied,* 543 U.S. 989 (2004); *cf. Souter v. Jones,* 395 F.3d 577, 597-602 (6th Cir. 2005). To establish such a claim, petitioner "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt" based on "new reliable evidence ... that was not presented at trial." *Schlup,* 513 U.S. at 324, 327. The exception is "rare" and is to be applied only in the "extraordinary case," where the "new facts raise[] sufficient doubt about [the petitioner's] guilt to undermine the confidence in the result of the trial." *Id.* at 317, 321. Petitioner has made no such showing in this

---

[3]A state appellate court deciding whether a trial court abused its discretion or otherwise committed prejudicial error under state law faces a different legal question than a state court deciding whether such error amounted to a constitutional due process violation. *Petrucelli,* 735 F.2d at 690 (citing *Steele v. Taylor,* 684 F.2d 1193, 1206 (6th Cir. 1982), *cert. denied,* 460 U.S. 1053 (1983)). In this case, the Ohio Court of Appeals was the only state appellate court that considered petitioner's claim on the merits. Because the court was not made aware of any constitutional concerns, it addressed and determined the issues as argued by petitioner, solely in terms of state law – *i.e.,* concluding that the trial court did not abuse its discretion in admitting the "other acts" evidence because the prior act was sufficiently similar to the charged murder offense to constitute admissible relevant evidence of petitioner's "modus operandi and in identifying him as the perpetrator of the charged offense." (*See* Doc. 8, Ex. 12, pp. 5-6).

case. Although petitioner contends that the evidence was insufficient to establish his guilt for the charged murder offense, establishing a colorable claim of actual innocence requires a showing of factual innocence, not mere legal insufficiency. *Bousley v. United States,* 523 U.S. 614, 623 (1998); *Hampton v. United States,* 191 F.3d 695, 703 (6th Cir. 1999).

Accordingly, in sum, the undersigned concludes that petitioner is not entitled to habeas corpus relief based on his claim in Ground One challenging the trial court's refusal to suppress "other acts" testimony, because: (1) to the extent petitioner alleges the trial court abused its discretion under state law, his claim is not cognizable in this federal habeas proceeding; and (2) petitioner has waived any claim of federal constitutional error due to his procedural default in failing to fairly present the federal issue on direct appeal to the Ohio Court of Appeals or, for that matter, in the instant federal habeas petition.

## B. Petitioner Procedurally Defaulted The Claims Alleged In Grounds Two, Three And Five And Is Not Entitled To Relief Or Review Of The Barred Claims Based On The Ineffective Assistance Of Appellate Counsel Claim Alleged in Ground Four And As "Cause" For His Procedural Default

In Grounds Two, Three and Five of the petition, petitioner claims that the evidence was insufficient to support his murder conviction, that the prosecutor engaged in misconduct during closing rebuttal argument at trial, and that his trial counsel was ineffective. (Doc. 1, pp. 7-9 & Attachment). In Ground Four, petitioner essentially alleges that his appellate counsel was ineffective in failing to assert the claims alleged in Grounds Two, Three and Five as assignments of error on direct appeal. (*Id.,* pp. 10-11).

Petitioner raised all of these claims for the first time in his application for reopening of the appeal, which was denied by the Ohio Court of Appeals on procedural *res judicata* grounds. (*See* Doc. 8, Exs. 13, 15). Petitioner exhausted the claims by reasserting them on further appeal to the Ohio Supreme Court; however, that court did not address the claims on the merits, but instead summarily dismissed the appeal "as not involving any substantial constitutional question." (*See id.,* Exs. 16, 18).

In the return of writ, respondent contends that petitioner has waived the claims alleged in Grounds Two, Three and Five due to his procedural default in failing to

present them as independent assignments of error on direct appeal, which was relied on by the Ohio courts in denying his application for reopening of the appeal. *(See id.,* Brief, pp. 12-14). Respondent further argues that petitioner neither can demonstrate "cause" for his procedural default of the claims alleged in Grounds Two, Three and Five nor is independently entitled to relief based on the merits of the ineffective assistance of appellate counsel claim alleged in Ground Four of the petition. *(Id.,* pp. 20-37).

It is well-settled that, on federal habeas corpus review, a court may be barred from considering an issue of federal law from a judgment of a state court if that judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision. *Harris v. Reed,* 489 U.S. 255, 260-62 (1989). The "adequate and independent state ground" doctrine has been applied to state decisions refusing to address the merits of a federal claim because of violations of state procedural rules. *Id.* at 261; *Sykes,* 433 U.S. at 86-87; *see also McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985).

Such a procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on the state procedural bar. *Harris,* 489 U.S. at 263. In cases where the last state court to render a reasoned opinion on the claim explicitly relies on a procedural bar, the court will presume that a later unexplained order did not silently disregard the procedural default and consider the merits of the claim. *Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991).

In addition, the rule precluding federal habeas corpus review of claims rejected by the state courts on state procedural grounds applies only in cases where the state rule relied on by the state courts is deemed "adequate" or, in other words, involves a "firmly established and regularly followed state practice" at the time that it was applied. *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991); *Richey v. Mitchell,* 395 F.3d 660, 679 (6th Cir.) (citing *White v. Schotten,* 201 F.3d 743, 751 (6th Cir.), *cert. denied,* 531 U.S. 940 (2000)), *rev'd on other grounds,* 546 U.S. 74 (2005) (per curiam); *Warner v. United States,* 975 F.2d 1207, 1213 (6th Cir. 1992), *cert. denied,* 507 U.S. 932 (1993).

In this case, the Ohio Court of Appeals was the last, and indeed only, state court to issue a reasoned decision rendering judgment on petitioner's application for reopening of the appeal. The court clearly and expressly relied on the state procedural *res judicata* doctrine in denying the application because petitioner could have raised

the claims on direct review in an appeal to the Ohio Supreme Court. (*See* Doc. 8, Ex. 15). The Ohio Supreme Court's later unexplained decision summarily dismissing petitioner's appeal of the reopening decision "as not involving any substantial constitutional question" must be presumed to rely on the same procedural default. *See Taqwiim v. Johnson,* 229 F.3d 1154 (table), No. 99-3425, 2000 WL 1234322, at **3 (6th Cir. Aug. 22, 2000) (unpublished) (citing *Levine v. Torvik,* 986 F.2d 1506, 1517 n.8 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), and *Ylst,* 501 U.S. at 803-04), *cert. denied,* 531 U.S. 1089 (2001).

As an initial matter, as respondent has suggested in the return of writ, petitioner committed a procedural default with respect to the record-based claims of constitutional trial error, which are alleged in Grounds Two, Three and Five of the petition. Pursuant to Ohio R. App. P. 26(B), these claims could not serve as independent justifications for reopening the appeal but rather only as examples of appellate counsel's ineffectiveness in the reopening application. In any event, the state procedural *res judicata* rule relied on by the Ohio Court of Appeals in denying the reopening application constituted an adequate and independent ground with respect to those claims, because they could have been asserted as assignments of error on direct appeal. *Cf. Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007) ("In Ohio, res judicata has long been held to bar consideration of constitutional claims in post-conviction proceedings ... when those claims have already been or could have been fully litigated either before judgment or on direct appeal from that judgment.") (quoting *Monzo v. Edwards,* 281 F.3d 568, 576 (6th Cir. 2002)), *cert. denied,* 128 S.Ct. 2971 (2008); *see also Williams v. Bagley,* 380 F.3d 932, 966-67 (6th Cir. 2004) (and numerous Sixth Circuit cases cited therein), *cert. denied,* 544 U.S. 1003 (2005).

On the other hand, the Ohio Court of Appeals' reliance on the state *res judicata* doctrine in also rejecting the ineffective assistance of appellate counsel claim alleged both as an independent ground for relief in Ground Four of the petition and as "cause" for petitioner's procedural default of Grounds Two, Three and Five,[4] does not constitute an "adequate" state bar to federal habeas review. The Ohio Supreme Court has expressly ruled that the state *res judicata* doctrine may not be applied to preclude review of an ineffective assistance of appellate counsel claim such as the one

---

[4]It is well-settled that appellate counsel's ineffectiveness may constitute "cause" for a procedural default occurring, as claimed here, in an appeal as of right to the Ohio Court of Appeals. *See Murray,* 477 U.S. at 488; *see also Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Burroughs v. Makowski,* 411 F.3d 665, 668 (6th Cir.) (per curiam), *cert. denied,* 546 U.S. 1017 (2005).

presented herein, which was properly presented in a timely reopening application under Ohio R. App. P. 26(B) and was not considered on the merits by the state supreme court in the direct review proceedings. *See State v. Davis,* 894 N.E.2d 1221 (Ohio 2008).

Accordingly, the undersigned concludes that the ineffective assistance of appellate counsel claim alleged in Ground Four of the petition and as "cause" for petitioner's procedural default of Grounds Two, Three and Five is subject to review on the merits. Because the Ohio Court of Appeals denied petitioner's reopening application without deciding or even considering whether the ineffective assistance of appellate counsel claim had any merit, respondent has presented a detailed argument in the return of writ addressing the claim. Essentially, respondent contends that petitioner's appellate attorney was not ineffective under the applicable standard of review established in *Strickland v. Washington,* 466 U.S. 668 (1984), because counsel asserted the strongest argument for reversal on direct appeal in contrast to the claims alleged in Grounds Two, Three and Five, which according to respondent, "would probably have had the reverse effect of detracting from the issue that ... appellate counsel did present." (*See* Doc. 8, Brief, pp. 22-37, 39).

To prevail on his ineffective assistance of counsel claim under *Strickland,* petitioner must demonstrate both (1) his attorney on direct appeal made such serious errors that he was not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) counsel's deficient performance prejudiced the defense. *See Strickland,* 466 U.S. at 687.

Under the first prong of the *Strickland* test, petitioner must show that appellate counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. Judicial scrutiny must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time the conduct occurred. *Id.* at 689. In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance. *Id.*

Appellate counsel is not constitutionally ineffective under this prong merely because he declines to raise a non-frivolous issue on appeal that was requested by the defendant. *Sharp v. Puckett,* 930 F.2d 450, 452 (5th Cir. 1991) (citing *Jones v. Barnes,* 463 U.S. 745, 751 (1983) (holding that an "indigent defendant [does not have] a

constitutional right to compel appointed counsel to press nonfrivolous points [on appeal] requested by the client")); *see also Johnico v. Chrones,* 187 Fed.Appx. 701, 703 (9th Cir. June 9, 2006) (not published in Federal Reporter) ("Appellate counsel has no duty to raise every single issue requested by a defendant."), *cert. denied,* 549 U.S. 1037 (2006). As the Supreme Court stated in *Barnes,* 463 U.S. at 754:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy.... Nothing in the Constitution or our interpretation of that document requires such a standard.

"Th[e] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (quoting *Barnes,* 463 U.S. at 751-52); *see also Coleman v. Mitchell,* 268 F.3d 417, 430-31 (6th Cir. 2001), *cert. denied,* 535 U.S. 1031 (2002). It is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim on direct appeal; however, "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Smith v. Robbins,* 528 U.S. 259, 288 (2000) (quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986)); *see also Wilson v. Hurley,* 108 Fed.Appx. 375, 379 (6th Cir. Aug. 30, 2004) (not published in Federal Reporter), *cert. denied,* 543 U.S. 1160 (2005).

To satisfy the second "prejudice" prong of the *Strickland* test, petitioner must demonstrate that a "reasonable probability" exists that, but for his counsel's errors, the result of the direct appeal proceeding would have been different. *See Strickland,* 466 U.S. at 694. Petitioner has met his burden if he shows that the result of the appeal would "reasonably likely have been different absent the errors." *Id.* at 695.

The Court need not examine the question of whether counsel's performance was deficient before addressing the question of whether petitioner was prejudiced by counsel's performance. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground. *Id.* at 697.

Here, petitioner has not demonstrated that his appellate counsel's representation was constitutionally ineffective under either prong of the *Strickland* test. The undersigned has reviewed the record and has addressed each of the underlying

procedurally-defaulted claims that petitioner contends his counsel should have raised on direct appeal. *See infra* pp. 13-26. For the reasons given below in rejecting those claims, the undersigned concludes, as argued by respondent, that they are "far weaker" than the assignment of error actually presented to and considered by the Ohio Court of Appeals on direct appeal. *(See* Doc. 8, Brief, p. 39). In any event, petitioner has not met his burden of showing that the result of the appeal would reasonably likely have been different if counsel had asserted any of the defaulted claims as assignments of error on direct appeal.

## 1. Ground Two: Prosecutorial Misconduct Claim.

In the reopening proceedings, petitioner claimed that his appellate counsel was ineffective in failing to raise a prosecutorial misconduct claim as an assignment of error on direct appeal. *(See* Doc. 8, Ex. 13, p. 5). Petitioner specifically challenged the propriety of eleven remarks made by the prosecutor during closing rebuttal argument, which he contended amounted to improper vouching, statements of personal belief, or mischaracterizations of the evidence. *(Id.,* pp. 6-10). The same claim has been alleged in Ground Two of the instant petition.

Courts faced with this type of prosecutorial misconduct claim must "afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were 'otherwise fair.'" *United States v. Henry,* 545 F.3d 367, 377 (6th Cir. 2008) (quoting *United States v. Young,* 470 U.S. 1, 11 (1985), and citing *United States v. Hitow,* 889 F.2d 1573, 1579 (6th Cir. 1989)); *see also Darden v. Wainwright,* 477 U.S. 168, 181 (1986) ("it 'is not enough that the prosecutor's remarks were undesirable or even universally condemned[;]'" rather, the "relevant question" is whether the prosecutor's challenged conduct rendered the trial fundamentally unfair in violation of due process); *Donnelly v. DeChristoforo,* 416 U.S. 637, 642-43 (1974). "[T]he touchstone of [the] due process analysis ... is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982).

The due process inquiry involves an assessment of the "probable effect [of the prosecutor's alleged misconduct] ... on the jury's ability to judge the evidence fairly" when viewed within the context of the entire trial. *Young,* 470 U.S. at 12. Reversal of a conviction is warranted only if it is determined that the prosecutor engaged in "flagrant" misconduct. *Henry,* 545 F.3d at 376. Upon a finding of impropriety by the prosecutor in closing argument, courts consider four factors in determining whether

the impropriety was "flagrant," or in other words, amounted to prejudicial error: (1) the degree to which the statements had a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused. *Id.*

In addition, another factor must be considered in this case given that all of the prosecutor's challenged comments were made in response to defense counsel's closing argument. In assessing whether prejudicial error occurred in this "invited response" context, the court "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *Id.* at 381 (quoting *Young,* 470 U.S. at 12). If found that the prosecutor's remarks were indeed "'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Id.* (quoting *Young,* 470 U.S. at 12-13).[5]

Turning to the specific remarks made in rebuttal that are challenged in the instant case, the Court is convinced upon review of the record that petitioner's appellate counsel neither acted unreasonably nor prejudicially affected the outcome of the appeal by failing to raise a prosecutorial misconduct claim on direct appeal.

In the first statement challenged by petitioner, the prosecutor made an exaggerated remark about "appeas[ing] the Monday morning quarterbacks" to the extent police investigators are subject to criticism for not taking "every single item out of the ... crime scene" for testing. (Doc. 8, Vol. 14 Tr. 1077-78). The statement, which was isolated, was not inflammatory and "did no more than [attempt to] 'right

---

[5]In *Henry,* the Sixth Circuit cited the following example of an "invited response" that did not amount to reversible error: "Although '[a] governmental attorney has a duty not to express a personal opinion or belief regarding the truth or falsity of any testimony or evidence,' the government may attempt to explain why, based on the facts, that witness's testimony is honest after the same has been attacked by the defense." *Henry,* 545 F.3d at 379 (quoting *United States v. Hurst,* 951 F.2d 1490, 1502 (6th Cir. 1991) (in turn citing *Young,* 470 U.S. at 8), *cert. denied,* 504 U.S. 915 (1992)); *cf. Hinkle v. Randle,* 271 F.3d 239, 245-46 (6th Cir. 2001) (holding that "[w]hile the prosecutor's remarks [in rebuttal argument] had the effect of boltstering the reliability of DNA evidence in general, they came in response to the defense counsel's invitation to comment on the state of the accuracy and reliability of DNA evidence;" therefore, petitioner failed to "show, to a degree sufficient to undermine confidence in the outcome of his trial, that the failure of his trial counsel to object to the prosecutor's rebuttal argument would have led to a different result" under *Strickland*).

14

the scale'" in response to defense counsel's extensive argument "that it was less than a perfect crime scene investigation" involving, among other things, the failure to test various items in the victim's apartment; to conduct a search in the hallway or upstairs area of the apartment building; to photograph every single bloody shoe print seen in and around the victim's apartment; to search the home of the person who discovered the victim's body; and to conduct tests on fingernail clippings taken from the victim's body. (*See id.,* Tr. 1054-56, 1058-61, 1064-65).

In the next set of statements challenged by petitioner, the prosecutor made comments about certain inferences that could be drawn from the "way [the victim's] body was found," as reflected in a photograph taken at the scene–specifically, that (1) the "reason for the attack was a sexual assault" given that the victim was "naked from the waist down;" and (2) the intended sex act was not completed, which undercut the significance of results of DNA testing conducted on semen recovered from the prostitute victim's body that failed to reveal any match to a known suspect. Contrary to petitioner's contention, it appears that the prosecutor did not exceed the bounds of propriety, but rather limited his remarks to evidence introduced at trial and reasonable conclusions that could be drawn from such evidence. In any event, the remarks were isolated, non-inflammatory, and were "invited" to the extent defense counsel had emphasized in closing argument the "lack of physical evidence" linking petitioner to the murder and, indeed, had specifically insinuated that the "unidentified male donor of the semen ... recovered from [the victim's] body" was the likely person who killed her. (*See id.,* Tr. 1052-53).

The next set of statements challenged by petitioner pertained to the testimony of State witness Dante Thompson, who was in and out of the victim's apartment the day she was killed and identified petitioner as the man he saw with the victim that day. The prosecutor expressed his belief that Thompson "was right about some things and ... was confused and inaccurate about others." (*Id.,* Tr. 1082). The prosecutor went on to refer specifically to the confusion exhibited by Thompson in his identifications of both petitioner and another man, Clarence Irvin, as the person seen with the victim both the night before and day of the murder, which the prosecutor explained was "a normal human thing" given the similarity in the two men's appearances. (*Id.,* Tr. 1088, 1090).

Assuming these statements were improper, they were "invited" and did no more than attempt to "right the scales" in response to two points made by defense counsel in closing argument: (1) Thompson's initial identification of Irvin was more credible than petitioner's identification of petitioner months later from allegedly "suggestive"

photo arrays; and (2) the State's case was weak to the extent "the State of Ohio may very well say ... Mr. Thompson must have been mistaken [in identifying petitioner as being in the the victim's apartment the night before the murder], got confused on times and faces and, actually, saw Clarence Irvin and was confused about the time." (*Id.,* Tr. 1039-41, 1043-48).

Petitioner also challenged three comments made by the prosecutor in response to defense counsel's lengthy closing argument that petitioner's connection to the victim's murder could not be established based on evidence that a small amount of petitioner's blood was found in the inside left-shoulder area of a black jacket discovered at the scene, which the State argued correlated with a scar on petitioner's left shoulder noticed months later when petitioner was arrested. (*Id.,* Tr. 1093, 1096, 1101-02). None of the prosecutor's comments, however, exceeded the bounds of propriety when viewed in the context of the entire record.

First, the prosecutor was justified in commenting once that "I think the evidence shows that he wasn't wearing that jacket when he killed [the victim], and he didn't immediately put it on after he killed the victim," in response to defense counsel's extensive argument that the jacket failed to establish petitioner's connection to the murder because although the victim's blood was all over the apartment, none of her blood was found on the jacket. (*Id.,* Tr. 1061, 1063-64, 1066-67, 1068).

In addition, the prosecutor was justified in stating in rebuttal that defense counsel was not qualified as an expert to opine as he had that the jury could not infer guilt on the basis of any correlation between the large scar on petitioner's left shoulder and the small amount of blood inside the jacket recovered at the scene, because "the amount of blood would have been enormous, not just a one-quarter inch by one-half inch spot in this black jacket." (*Id.,* Tr. 1068). Finally, the prosecutor may have inappropriately referred to the scar on petitioner's shoulder as a "healing scar." However, the remark was passing, and the photograph of the scar was in evidence for the jury to make its own determination. Indeed, on defense counsel's objection to the "characterization of the mark as healing," the prosecutor left the matter to the jury, stating only: "There's a close-up, a better shot of it. Take a look at it." (*Id.,* Tr. 1102).

Petitioner next challenged a comment by the prosecutor responding to statements made by defense counsel in closing argument emphasizing that on his last visit to the victim's apartment before she was killed, Dante Thompson saw "another man," who was younger and shorter, "not a big man" like petitioner, "sitting right next

to the door smoking crack cocaine." (*See id.,* Tr. 1042-43, 1047). The prosecutor argued in response that "this phantom individual" was not mentioned by Thompson "until a year later when he's on the stand," and that in any event, the person was a "small guy" whereas the bloody Nike shoe prints left at the crime scene were made by a "big guy." (*Id.,* Tr. 1099). The remark was not improper to the extent the prosecutor relied on evidence to point out weaknesses in defense counsel's argument. In any event, the comment was passing and did not exceed the bounds of propriety in responding to defense counsel's invitation.

Finally, petitioner objected to the prosecutor's statement, "I'll tell you what the reasonable inference is" in determining the "purpose " for "all the[] superficial cuts" found on the victim's body that "weren't going to kill her." (*Id.,* Tr. 1105). These comments were "invited" to the extent defense counsel had argued that a prior "sexual assault" committed by petitioner did "not create a form of behavioral fingerprint that in and of itself proves the identity of the perpetrator in this case." (*See id.,* Tr. 1070). In any event, on defense counsel's objection to "that line" of argument, the trial court overruled the objection, but instructed the jury: "Ladies and gentlemen, as I mentioned to you, closing argument is the perception of each side, what they feel the evidence has shown. You're the folks that make the determination on the facts." (*Id.,* Tr. 1105-06). Given this curative instruction, it is highly unlikely that the prosecutor's remarks had a prejudicial impact on the jury's ability to judge the evidence fairly.

Accordingly, in sum, the Court concludes that petitioner's allegations of prosecutorial misconduct are weak in comparison to the stronger claim challenging the admission of "other acts" evidence that was prosecuted by appellate counsel on direct appeal. In any event, it is not reasonably likely that petitioner would have prevailed on the meritless prosecutorial misconduct claim alleged in the reopening proceedings and in Ground Two of the petition. Therefore, petitioner has not shown that his appellate counsel was ineffective under either prong of the *Strickland* test in failing to assert the claim as an assignment of error on direct appeal.

## 2. Ground Three: Sufficiency of Evidence Claim.

In the reopening proceedings, petitioner contended that his appellate counsel was ineffective in failing to raise the claim alleged in Ground Three of the petition that the evidence was insufficient to sustain his murder conviction. (Doc. 8, Ex. 13, p. 1).

The Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship,* 397 U.S. 358,

363-64 (1970). In determining whether or not the evidence presented at trial was sufficient to satisfy this due process standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original).

This standard does not require the State to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, under this standard, the reviewing court "faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6ᵗʰ Cir.), *cert. denied,* 464 U.S. 951, 962 (1983). It is the jury's responsibility as the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the trier of fact which convicted the petitioner. *Id.* at 318-19 & n.13; *see also York v. Tate,* 858 F.2d 322, 329 (6ᵗʰ Cir. 1988) (per curiam), *cert. denied,* 490 U.S. 1049 (1989).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6ᵗʰ Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6ᵗʰ Cir. 2000)). Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged chrime. *Id.* at 796-97 (and Sixth Circuit cases cited therein); *see also United States v. Slewa,* No. 06-20519, 2008 WL 5244353, at *6 (E.D. Mich. Dec. 16, 2008) (unpublished).

Here, sufficient evidence was presented at trial for a rational trier of fact to make a permissible inference that petitioner was guilty of the charged murder offense. Respondent has provided a detailed chronicle of the evidence that was introduced to establish petitioner's presence at the scene of the crime the day the victim was found brutally murdered, and that he was the individual who committed the offense. (*See* Doc. 8, Brief, pp. 23-29).

Specifically, Dante Thompson, the victim's cousin, testified that on that day he was in and out of the victim's apartment, which belonged to their aunt. He used the bathtub in the apartment to store his supply of marijuana as well as some of his clothes; he said that he sold marijuana "on the street" and would go back to the

18

apartment whenever he needed a "refill." (*Id.*, Vol. 10 Tr. 443, 445-46). Thompson observed a man sitting on the couch the first two times he entered the apartment. He described the man as "fat," with "titties and a big belly;" the man was bald, and his head was "shaped like a cone." (*Id.*, Tr. 448-49, 453, 478).

The third time Thompson returned to the apartment to retrieve more marijuana to sell, his cousin was mopping the floor. (*Id.*, Tr. 454). Thompson first testified that "[t]here was somebody else in there then," but then went on to express that he was "confused. I am trying to get it right. Let me think. Let me think.... Trying to think. Was threre somebody there before she mop[?] Nobody was there because everybody leave to mop." (*Id.*, Tr. 454-55). The prosecutor asked again: "Time you came in she was mopping, nobody was there? Thompson responded, "Right." (*Id.*, Tr. 455).[6]

A half hour later, Thompson tried to get in the apartment, but no one responded when he knocked to gain entrance into the building. (*Id.*, Tr. 455-56). Thompson eventually was able to enter the apartment later in the afternoon when a tenant in another upstairs unit, Michael Gibson, let him into the building; the door to the victim's apartment was unlocked. (*Id.*, Tr. 456-57). That is when Thompson discovered the victim had been killed; he found her lying face down on the bathroom floor and, after noticing "a lot of blood," immediately went to a nearby fire station for assistance. (*Id.*, Tr. 457-60).

Clarence Irvin was first targeted by the police as the prime suspect.[7] (*See id.*, Vol. 12 Tr. 911). He was among a group of bystanders who gathered outside the apartment building around 4:30 in the afternoon when the police arrived at the scene.

---

[6]On cross-examination, Thompson continued to exhibit confusion, but testified that he thinks he returned to the apartment *after* the victim mopped the floor and saw a "different man" sitting next to the door smoking crack cocaine; Thompson said the man was the "last person" he saw in the victim's apartment before her death. (Doc. 8, Vol. 10 Tr. 480-81, 483). Thompson affirmed the man "wasn't a big man" and "[d]efinitely wasn't" petitioner. (*Id.*, Tr. 482). Thompson described him as a short, bald African-American man, in his "late 30s," who wore thick glasses. (*Id.*). Apparently, Thompson first mentioned this person at the state trial proceedings.

[7]It appears from the record that the police also investigated Dante Thompson and a few other people as possible suspects and obtained DNA samples from them. (*See* Doc. 8, Vol. 11 Tr. 773; Vol. 12 Tr. 916). In addition, Thompson was questioned and his shoes were checked to determine if he could have been the one who left the bloody shoe prints found at the scene. (*See id.*, Vol. 11 Tr. 704; Vol. 12 Tr. 910-11). Apparently, none of these individuals ended up triggering any serious concerns for the police.

*(See id.,* Vol. 10 Tr. 565). Someone pointed him out as having "been in that house before," and he was immediately taken along with Thompson to the station for questioning. *(Id.,* Tr. 565-66).

Irvin testified that he was with the victim in the early morning hours that day; he arrived at the apartment around 1:15 a.m. and left at 3:45 a.m. because he had to report to work at the Great American Ballpark by 5:00 a.m. *(Id.,* Tr. 559-60). Although Dante Thompson initially identified Irvin from a photo array as "look[ing] like" the man he had seen in the victim's apartment during the day *(see id.,* Tr. 463-64; Vol. 12 Tr. 911-12), Irvin was cleared as a suspect. The police were able to independently verify that Irvin could not have committed the murder because he was at work until 2:00 p.m., and after work, traveled by bus to his mother's home for an inhaler and then by "bootleg cab" to his credit union to cash a check. Irvin arrived at the credit union too late, just past the 4:30 closing time; he spoke with a teller there, who would not allow him in. *(Id.,* Vol. 10 Tr. 562-64; Vol. 12 Tr. 913-14).

Petitioner became a suspect eight months later after results from DNA testing conducted on two items taken from the crime scene revealed a match with petitioner's DNA on file in the police department's data base. *(Id.,* Vol. 12 Tr. 923-26). Specifically, petitioner's DNA was found in (1) a mixture of blood and saliva on a broken crack pipe, which also contained the victim's DNA; and (2) a blood spot discovered "on the inside left collar area" of a black jacket that had been dropped in the kitchen on top of one of the bloody shoe prints. *(Id.* & Vol. 11 Tr. 778-83, 786, 789).[8]

Jennifer Ann Luke, a Cincinnati Police homicide detective, testified at trial that these two items were significant because they were the ones that stood out as "out of place" in the "very cluttered scene." *(Id.,* Vol. 12 Tr. 926-27). She explained:

....It was hot out that day. I remember sweating in that apartment. Who would be wearing a jacket? That jacket was in the kitchen. There was no other clothing thrown around that place.... There were crack pipes,

---

[8]Dante Thompson's DNA also was found in the hood, armpit and neck areas of the jacket. (Doc. 8, Vol. 11 Tr. 784-85). However, Thompson explained that the jacket was his and that he kept it in the bathtub of the victim's apartment. *(Id.,* Vol. 10 Tr. 470-71). He said the "last time [he] wore th[e] jacket" was "when it was cold," and that he definitely did not take the jacket out of the tub on September 5th of 2003, the date of the murder, because it was "[t]oo hot for a jacket." *(Id.)*

yes, but that crack pipe was broken and it was where the shoeprints were.
It wasn't like the broken crack pipe was outside. It was in there where
all this activity was taking place. It had been dropped, smashed, stepped
on, I don't know.

(*Id.,* Tr. 927).

Ronald Camden, an experienced Cincinnati Police "crime scene examiner" (*see
id.,* Vol. 10 Tr. 578), corroborated Luke's assessment of the two items' significance.
When questioned on direct examination, he testified in pertinent part:

Very first thing you noticed out of place, you walk in the first door, you
saw bloody footprints. Then to the left as you looked down, I saw some.
Right inside the place to the left I saw what I believed to be a glass crack
pipe broken on the floor. That was out of place. Describing the things
out of place. The other descriptions wouldn't make any difference to
you.

Q. Things that catch your attention?

A. Yes. That shouldn't be there like that. As you walk to the left side
where the kitchen is, you notice another bloody shoe print. Most
apartments do not have bloody shoe prints, so you look at that. You go
further.

We noticed that there was a black velvet coat laying on the floor. Past
that there was a blood drop....

****

....This black coat looked out of place. It is laying on the floor. Other
clothes weren't on the floor. They were in the bathtub. Bathtub was not
here. Everything else was hung up....

....We have a black velvet sweatshirt. We moved it, found a bloody shoe
print ... underneath that jacket.

Q. Bloody shoe print. You could not see that until you lifted up and
moved that sweatshirt?

A. Correct.

Q. Can you think of any way that that shoe print could have been left in that location after that sweatshirt was dropped there?

A. Not in our real world.... That shoe print was put there first....

\*\*\*\*

....Here is the broken crack pipe. Little unusual. Crack pipes are usually on a table in an ashtray not usually on the floor cracked and broken. Another thing a little unusual, next to it, bloody shoe print. Same design as we see throughout the house. Shouldn't have been there. Little unusual. We took a picture.

(*Id.*, Tr. 591, 607-08).

Camden submitted both the broken crack pipe and the black jacket to the crime lab for further testing. (*Id.*, Tr. 622-23). He stressed again the value of any DNA evidence that might be obtained from the jacket, pointing out that because it was found on top of one of the bloody shoe prints, "we knew that was put there after she was murdered." (*Id.*, Tr. 624).

More evidence of guilt was elicited once the police began to pursue the new lead offered by the DNA evidence linking petitioner to critical evidence recovered from the crime scene. Importantly, petitioner, who is similar in appearance to Irvin, "fit [the] description" of the man seen with the victim in her apartment on the day she was killed: "he had a bald, shiny head; he was a big man; he had a belly; and he had the breasts" that Dante Thompson had described. (*Id.*, Vol. 12 Tr. 928-29, 953). Police detective Luke's suspicions were heightened even further when she noticed scars on petitioner's left shoulder, because "that would have been the location or similar location where somebody put on that jacket where blood may have transferred." (*Id.*, Tr. 955-56).

Dante Thompson was presented with a photo array containing a photograph of petitioner wearing glasses; he pointed to petitioner and another person in the array and stated that they "look[ed] familiar." (*Id.*, Vol. 10 Tr. 467-68). When he pointed to petitioner's photograph, Thompson indicated that the man "looked like him," but was

22

not wearing glasses. (*See id.,* Tr. 467). Thereafter, Thompson was presented with another photo array containing a different photograph of petitioner without glasses; Thompson unequivocally picked petitioner out of that array, identifying him as the person he saw at the victim's apartment on the day she was killed. (*Id.,* Tr. 469). In addition, Michael Gibson identified petitioner as the man he had observed "walking back and forth" in front of the apartment building "[a]round lunchtime" that day. (*Id.,* Tr. 533, 540-42).

Another witness, Robert Easley, testified that petitioner told him about killing a woman in the Over-the-Rhine area when the two men were incarcerated together at the Hamilton County Justice Center in June 2004. (*Id.* Vol. 12 Tr. 853, 856-61). According to Easley, petitioner said that he and the woman were "getting high and he wanted the female to have sex, ... but she didn't want to perform for him like he wanted her to." (*Id.,* Tr. 859). Easley testified: "She got upset because he wouldn't give her no money, and I guess words were exchanged, he grabbed her around the neck and, he said, started choking her." (*Id.*). Petitioner told Easley that he and "the girl got into a struggle and she fell to the floor;" as the woman was falling, she hit petitioner, which caused him to "los[e] it." (*Id.*, Tr. 860). Petitioner said that "he just blew up;" he "tore her clothes off of her," had sex with her, and killed her. (*Id.*, Tr. 861).

Finally, the videotaped deposition of Frances Green was admitted into evidence to establish petitioner's identity as the perpetrator of the brutal assault committed against the victim. On direct appeal, the Ohio Court of Appeals provided the following summary of Green's testimony, which is presumed correct under 28 U.S.C. § 2254(e)(1):[9]

Green testified that she had been raped by [petitioner] in 1980. Green

---

[9]Specifically, 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Although petitioner has moved to compel the transcription of Green's videotaped depostition for production in this case (*see* Doc. 16), he has neither cited nor presented any evidence to rebut the Ohio Court of Appeals' factual findings quoted herein. Therefore, he has not shown that such findings are erroneous. It is further noted that the state appellate court's summary of Green's videotaped testimony is sufficient for the Court to properly adjudicate petitioner's claim that his appellate counsel was ineffective in failing to challenge the sufficiency of evidence on direct appeal; therefore, petitioner's motion to compel has been denied by separate Order issued this date.

had been casually acquainted with [petitioner] before the rape. On the evening of September 17, 1980, [petitioner] twice came to Green's home to discuss the planning of a surprise birthday party for one of Green's neighbors. Because she had met him before socially, Green voluntarily invited [petitioner] into her home. Green had been preparing food in the kitchen, with the assistance of a steak knife, during [petitioner's] second visit.

As she was speaking to [petitioner], Green put the steak knife down. [Petitioner] grabbed the knife and held it against her throat. [Petitioner] held on to Green by the hair on her head as he forced her into one of the bedrooms in her home. [Petitioner] ordered Green to take off her clothes, and when she hesitated, he punched her in the face. [Petitioner] proceeded to rape Green. He next ordered her to perform oral sex, and as she attempted to comply, [petitioner] forcefully pulled on Green's hair, causing her physical pain. After a violent struggle, during which [petitioner] repeatedly struck Green in the head, she was able to escape.

(*Id.,* Ex. 12, pp. 4-5).

When viewing this evidence in the light most favorable to the prosecution, as required by *Jackson,* the Court is convinced that a rational juror could have found beyond a reasonable doubt that petitioner was present with the victim in her apartment on the day she was killed and was the perpetrator of the charged murder offense.

Petitioner has cited the testimony of defense witness Ronald Hatton as establishing his "actual innocence." Hatton, the second shift plant manager at KDM Sign Company (KDM), testified at trial that petitioner was an employee of KDM in September 2003. Hatton stated that according to the company's work records, petitioner clocked into work at 3:30 p.m. on Thursday, September 4, 2003 and "clocked out at the end of the day at 2:00 in the morning" on Friday, September 5th. (Doc. 8, Vol. 11 Tr. 832-33). Contrary to petitioner's contention, this testimony did not constitute conclusive evidence of petitioner's innocence because it did not cover the critical daytime period of September 5, 2003, when Dante Thompson said he saw petitioner with the victim in her apartment before she was found murdered later that afternoon. In any event, Hatton's testimony was effectively undermined on cross-examination when additional testimony was elicited that the company's records also included an "absentee slip" by petitioner's work "mentor" stating that petitioner "was absent September 4[th]" and had "called off work" because he "had to move." (*See id.,*

Tr. 841-44).

Finally, petitioner has cited the evidence introduced at trial which supported the defense theory that another man may have committed the murder or otherwise served to impeach the credibility of certain witnesses who testified against him. However, it was the jury's responsibility to resolve the conflicts in testimony and to assess the credibility and weight to be accorded the various witnesses' testimony. *See Jackson,* 443 U.S. at 319. There was enough evidence presented by the prosecution to support the reasonable inference that petitioner was present in the victim's apartment and committed the brutal assault that resulted in the victim's death on the afternoon of September 5, 2003.

Accordingly, in sum, because petitioner's sufficiency of evidence claim is meritless, the undersigned concludes that petitioner's appellate counsel was not ineffective in failing to raise the claim as an assignment of error on direct appeal.

### 3. Ground Five: Ineffective Assistance of Trial Counsel Claim.

In the reopening proceedings, petitioner argued that his appellate counsel was ineffective in failing to raise the ineffective assistance of trial counsel claim alleged in Ground Five of the petition as an assignment of error on direct appeal. (Doc. 8, Ex. 13, pp. 1-3). Specifically, petitioner contended his trial counsel's performance should have been challenged based on counsel's failure to impeach State witness Robert Easley on the basis of his mental illness; to prove petitioner's "[i]nnocence;" to impeach the testimony of Dante Thompson; and to request an *in camera* evaluation pertaining to testimony given by State witness Michael Gibson. (*Id.*).

The record belies petitioner's claims of ineffectiveness. Contrary to petitioner's allegations, defense counsel conducted an effective cross-examination of Easley in an effort to impeach his credibility not only on the basis of his mental illness, but also on other grounds including prior convictions for offenses involving dishonesty. (*See id.,* Vol. 12 Tr. 868-75). Petitioner's trial counsel also extensively cross-examined Dante Thompson in an effort not only to impeach Thompson's general credibility as a witness, but also specifically to point out weaknesses in his identification testimony, to undermine his testimony on direct examination about his actions at the crime scene, and to elicit favorable testimony from Thompson about observing "another man" in the victim's apartment the last time she was seen alive. (*See id.,* Vol. 10 Tr. 475-506).

In addition, contrary to petitioner's allegation that his counsel failed to advocate

25

a theory of innocence, it is clear from the record that throughout the entire trial, defense counsel sought to elicit evidence that tended to prove petitioner's innocence and to undermine the evidence of guilt connecting petitioner to the crime scene. Indeed, counsel moved for an acquittal at the close of the State's case, arguing the evidentiary points which supported the defense theory that an "unidentified individual" killed the victim. (*Id.,* Vol. 13 Tr. 1019-20). Moreover, counsel's lengthy closing argument to the jury essentially was devoted to pointing out every fact from which an inference of "innocence" could be drawn, as well as every weakness in the State's case. (*See id.,* 1034-72).

Finally, petitioner has not indicated how an *in camera* evaluation of State witness Michael Gibson's testimony would have helped his case. Defense counsel conducted an effective cross-examination of Gibson at trial; specifically, counsel sought to impeach Gibson's identification testimony by casting doubt on his general credibility as a witness and pointing out that Gibson never told the police that he "had seen a man walking up and down the street in front of the apartment," as well as various problems with Gibson's description of the man he claimed he saw on the day of the murder. (*See id.,* Vol. 10 Tr. 542-48).

Accordingly, in sum, petitioner's allegations of ineffective assistance by trial counsel are belied by the record. Because petitioner has not demonstrated that such a claim has any merit, the undersigned concludes that petitioner's appellate counsel was not ineffective in failing to raise the claim as an assignment of error on direct appeal.

## C. Petitioner's Claim In Ground Six Challenging The State Court's Denial Of His Reopening Application Is Not Cognizable In This Proceeding

In Ground Six of the petition, petitioner alleges that he is entitled to habeas relief because the Ohio Court of Appeals abused its discretion in denying his application for reopening of the appeal on *res judicata* grounds. (Doc. 1, "Attachment"). Petitioner's allegations do not give rise to a cognizable constitutional claim subject to review in this federal habeas proceeding.

A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court

determinations on state-law questions"). Petitioner's claim, which stems from the Ohio Court of Appeals' alleged abuse of discretion under Ohio law in ruling on a reopening application filed pursuant to Ohio R. App. P. 26(B), does not trigger concerns about a possible violation of petitioner's federal constitutional rights.

In any event, the writ of habeas corpus is not the proper means by which prisoners can challenge errors or deficiencies in state post-conviction proceedings, such as the one involved here,[10] which address collateral matters and not the underlying conviction giving rise to the prisoner's incarceration. *Kirby v. Dutton,* 794 F.2d 245, 247 (6th Cir. 1986). Petitioner's allegation of error in ruling on his state reopening application is such a "collateral matter," because it does not affect or relate to petitioner's underlying conviction and sentence.

Accordingly, petitioner is not entitled to habeas relief based on the non-cognizable claim alleged in Six of the petition challenging the Ohio Court of Appeals' denial of his application for reopening on *res judicata* grounds.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the claims alleged in Grounds One, Two, Three and Five of the petition, which this Court has concluded are waived and thus procedurally barred from review, because under the first prong of the applicable two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this

---

[10]It is now well-settled in the Sixth Circuit that in accordance with Ohio's long-standing practice, applications for reopening of the appeal under Ohio R. App. P. 26(B), which fall "beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an appellate court," *Douglas v. California,* 372 U.S. 353, 356 (1963), are to be considered "part of the collateral, post-conviction process rather than direct review," *See, e.g., Lopez v. Wilson,* 426 F.3d 339, 344 n.3, 351-57 (6th Cir. 2005) (en banc) (and numerous state cases cited therein), *cert. denied,* 547 U.S. 1099 (2006); *Morgan v. Eads,* 818 N.E.2d 1157, 1160-61 (Ohio 2004) (and state cases cited therein).

Court is correct in its procedural ruling.[11] A certificate of appealability also should not issue with respect to the claims alleged in Grounds Four and Six of the petition, which are not procedurally barred from review, in the absence of a substantial showing that petitioner has stated a "viable claim of the denial of a constitutional right" or that the issues presented are "adequate to deserve encouragement to proceed further." *See Slack,* 529 U.S. at 475 (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and, therefore, should **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: 4/20/09

Timothy S. Hogan
United States Magistrate Judge

J:\BRYANCC\2009 habeas orders\08-113denypet.waiv-fedQ.waiv-uaac.prosmisc.mfficevid-murder.iac.noncogniz-reopenapplic.wpd

---

[11]Because the first prong of the *Slack* test has not been met, the Court need not address the second prong of *Slack* as to whether "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim in Grounds One, Two, Three or Five of the petition. *See Slack,* 529 U.S. at 484. However, it is noted that for the reasons given in rejecting petitioner's argument that appellate counsel's ineffectiveness constitutes "cause" for his procedural default of the claims alleged in Grounds Two, Three and Five, *see supra* pp. 13-26, it appears that the second prong of the *Slack* test has not been met with respect to those claims.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Mallon Roberts,
    Petitioner

vs

Case No. 1:08cv113
(Spiegel, S.J.; Hogan, M.J.)

Warden, Toledo Correctional
Institution,
    Respondent

# NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action. Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof. Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s). Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections. *See* Fed. R. Civ. P. 72(b). A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X ☒ Agent ☐ Addressee <br> B. Received by ( *Printed Name* )    C. Date of Delivery |
| 1. Article Addressed to: <br><br> Mallon Roberts # 489-522 <br> Toledo Corr. Inst. <br> 2001 East Central Ave. <br> Toledo, OH 43608 | D. Is delivery address different from item 1? ☐ Yes <br> If YES, enter delivery address below: ☐ No <br><br><br> 3. Service Type <br> ☒ Certified Mail ☐ Express Mail <br> ☐ Registered ☐ Return Receipt for Merchandise <br> ☐ Insured Mail ☐ C.O.D. <br> 4. Restricted Delivery? *(Extra Fee)* ☐ Yes |
| 2. Article Number <br> *(Transfer from service label)*    7002 3150 0000 8388 4926 | |
| PS Form 3811, August 2001    Domestic Return Receipt | 102595-01-M-2509 |

1:08cv113 (Doc. 17)